**Affirmed and Opinion Filed May 13, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01329-CR
### No. 05-12-01336-CR

**LAKENDRICK DUMANDRE HAYDEN, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 265th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F09-62407-R**

## MEMORANDUM OPINION
Before Justices Bridges, Lang, and Evans
Opinion by Justice Bridges

Lakendrick Dumandre Hayden appeals the revocation of his probation on a forgery charge[1] in cause number 05-12-01329-CR and his aggravated robbery conviction in cause number 05-12-01336-CR. A jury convicted appellant of aggravated robbery in cause number 05-12-01336-CR and sentenced him to fifteen years' confinement. The trial court subsequently adjudicated appellant guilty of violating the terms and conditions of his probation by committing an aggravated robbery and sentenced him to two years' confinement. In three issues, appellant argues the evidence is insufficient to support his aggravated robbery conviction, the trial court erred in allowing a detective to testify concerning statements appellant made during custodial

---

[1] In his brief, appellant does not raise any arguments in connection with the revocation of his probation or the underlying forgery charge. Accordingly, we will not address this issue further.

interrogation, and he received ineffective assistance of counsel. We affirm the trial court's judgments.

On October 17, 2011, Osvaldo Moreno was at home practicing pool with David Hernandez, a member of Osvaldo's billiards team. Osvaldo's wife, Rosario, and his four children were also at home. At approximately 9:45 p.m., Rosario heard a knock on the front door, looked out the peep hole, and saw an African-American man with "braids that were going all the way back." Rosario went and told Osvaldo there was "a black guy at the door," and Osvaldo came to the door and looked outside. A man was "just standing there" and asked for "somebody." Osvaldo said "it's the wrong house," but he opened the door to talk to the man.

The man and another man who had been hiding pushed open the door. Both men had guns, and Osvaldo stopped trying to push the door closed when he saw a gun pointed at him. One of the men was skinny "with braids." The men told Osvaldo to get on the ground, and Osvaldo complied. The men zip-tied his arms behind his back, and one man went to zip-tie Rosario. The men asked Osvaldo for drugs and money, but Osvaldo told them there were no drugs or money and they had the wrong house. At that point, there were four men in Osvaldo's house, and each one had a handgun. None of the men wore gloves or face masks, and Osvaldo heard them talking to each other and talking to someone else on a radio.

Osvaldo led the men to a closet where they took an unloaded rifle before bringing Osvaldo back to the living room and putting him on the floor. The men brought Rosario to the living room and put her on the floor next to Osvaldo. One of the men threatened to shoot Rosario if Osvaldo did not tell the location of the drugs and money. While one of the men kept Osvaldo on the ground, the other men gathered up televisions, an Xbox, and a camera. At one point, one of the men said behind Osvaldo's back "You're done for," and Osvaldo heard a gunshot "right above [his] head." Realizing he was not shot, Osvaldo asked Rosario if she was

okay and she said she was fine. Osvaldo realized the men were gone and the door was left open as if they might return. Osvaldo was able to slide a hand free, get up, and look outside where he saw one of the men returning and pointing a gun. Osvaldo closed the door, locked it, and helped Rosario up. Osvaldo ran to the back of the house to check a door and then to a room where a window was open. Rosario called the police. On the ground inside the house was a television "the guy was coming back to get." The television had been removed from the table on which it sat. Police arrived quickly, and a crime scene investigator took pictures and lifted some fingerprints from the television that had been set on the floor.

Dallas police detective Lorne Ahrens was assigned to investigate the case, and he received notice from the automated fingerprint identification unit that the fingerprint lifted from the television at Osvaldo's home matched appellant's fingerprint. Ahrens had an arrest warrant issued and generated a photo lineup including appellant's photograph. When shown the photo lineup, Osvaldo did not identify appellant.

An undercover unit arrested appellant and brought him to police headquarters. Following his arrest, appellant was searched, and an officer found a pawn ticket in appellant's pocket. The ticket contained appellant's name and identifying information and showed a Toshiba television was pawned on October 25, 2011. At headquarters, Ahrens read appellant his *Miranda* rights, and appellant waived his rights. Appellant said he had not been in the area of Osvaldo's house. When asked how his fingerprints came to be at Osvaldo's house, appellant said it might have occurred when appellant was "manipulating" some football gloves at his residence, and his cousin asked to borrow the gloves. Appellant theorized that his cousin was involved in this offense and the fingerprints were transferred from appellant to the gloves to the cousin to the television. Regarding the pawn ticket, appellant told Ahrens he had gotten the pawned television from "Matt" and pawned the television for money. Ahrens later accompanied Osvaldo to the

–3–

pawn shop listed on the pawn ticket taken from appellant. Osvaldo identified the pawned TV as his.

At trial, appellant testified he was at a friend's apartment having a barbecue with his wife and friends on the day of the robbery. Appellant testified that, sometime after that day but before his arrest, he bought the television he subsequently pawned. Appellant testified one of Osvaldo's friends had taken appellant to Osvaldo's house "a couple of weeks" before October 17, 2011 "to buy powder cocaine." Appellant went to Osvaldo's house a total of "two or three" times. Appellant testified he could have touched the television while he was inside Osvaldo's house, but he was "not necessarily sure." A jury convicted appellant of aggravated robbery in cause number 05-12-01336-CR. Following his conviction, the trial court revoked his probation in cause number 05-12-01329-CR and adjudicated his guilt on a forgery charge. These appeals followed.

In his first issue, appellant challenges the legal sufficiency of the evidence to support his aggravated robbery conviction. Specifically, he argues the "only testimony concerning the 'use or exhibition' of firearms was either unattributed to [appellant] or was mere possession."

When reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the credibility of witnesses and of the weight given to their testimony, any conflicts or inconsistencies in the evidence are resolved in favor of the verdict. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Our review includes both

–4–

properly and improperly admitted evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Id.*

A person commits the offense of aggravated robbery if, while in the course of committing theft, and with intent to obtain or maintain control over property, the person intentionally or knowingly threatens or places another in fear of imminent bodily injury or death and uses or exhibits a deadly weapon during the commission of the offense. TEX. PENAL CODE ANN. § 29.03(a)(2) (West 2011). A deadly weapon includes anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury. *Id.* § 1.07(17). A firearm is a device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use. *Id.* § 46.01(a)(3). A firearm is, by definition, a deadly weapon. *Id.* § 1.07(17).

To "use" a deadly weapon during the commission of an offense means that the deadly weapon was employed or utilized in order to achieve its purpose; to "exhibit" a deadly weapon requires only that it be consciously displayed during the commission of the required felony offense. *Patterson v. State*, 769 S.W.2d 938, 940–41 (Tex. Crim. App. 1989); *see McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000) (butcher knife partially concealed in appellant's pocket during attack was deadly weapon used or exhibited in facilitating offense). The law does not require that the actor commit an overt gesture with the weapon; the mere carrying of a weapon during a robbery can be legally sufficient evidence for a jury to conclude that the intended use of the weapon was that it be capable of causing death or serious bodily injury. *McCain*, 22 S.W.3d at 503.

A person is criminally responsible for an offense committed by another if, acting with the intent to promote or assist the commission of the offense, that person solicits, encourages,

directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011). Thus, under the law of parties, the State may enlarge an accused's criminal responsibility to include acts in which he may not be the principal actor. TEX. PENAL CODE ANN. § 7.01(a) (West 2011); *Goff v. State*, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996). A person can be convicted as a party even if the indictment does not explicitly charge him as a party. *Marable v. State*, 85 S.W.3d 287, 288 (Tex. Crim. App. 2002).

Here, the record shows two men forced their way into Osvaldo's house. By the time Osvaldo had his hands zip-tied behind his back, there were four men in the house. Each of the four men had a handgun. The men stole a rifle, televisions, an Xbox, and a camera. The men left a television on the ground inside the house where it had been removed from the table on which it sat. Appellant's fingerprint was on the television that had been set on the floor. Further, appellant pawned a television that had been stolen from Osvaldo's. The jury was free to believe that appellant was one of the men with guns who invaded Osvaldo's house and set a television on the floor. Under these circumstances, the jury could have found beyond a reasonable doubt that appellant committed aggravated robbery. *See Temple*, 390 S.W.3d at 360. We overrule appellant's first issue.

In his second issue, appellant argues the trial court erred in allowing Ahrens to testify to the contents of the recording of appellant's custodial interrogation. Specifically, appellant complains of the admission of statements appellant made after requesting counsel.

An accused has the right to have an attorney present during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). Once an accused has invoked that right, police interrogation must stop until counsel has been made available or the accused himself initiates a dialogue with the police. *Edwards*, 451 U.S. at 484–85; *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009). However, not every mention of a lawyer will suffice to invoke the right

to the presence of counsel during questioning. *Gobert*, 275 S.W.3d at 888; *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995). An ambiguous or equivocal statement regarding counsel does not require officers to halt the interrogation or even to seek clarification. *Davis v. United States*, 512 U.S. 452, 461–62 (1994); *Gobert*, 275 S.W.3d at 892. A suspect must articulate his desire for counsel to be present for purposes of custodial interrogation, and he must do so with sufficient clarity that a reasonable officer under the circumstances would understand it to be just that. *Davis*, 512 U.S. at 459; *Gobert*, 275 S.W.3d at 892–93; *see Lucas v. State*, 791 S.W.2d 35, 45 (Tex. Crim. App. 1989) ("The right to counsel is considered invoked where a person indicates he or she desires to speak to an attorney or have an attorney present during questioning."). Whether the particular mention of an attorney constitutes a clear invocation of the right to counsel during questioning depends on the statement itself and the totality of the surrounding circumstances. *Davis*, 512 U.S. at 459; *Gobert*, 275 S.W.3d at 892.

Here, the record shows appellant was placed alone in an interrogation room. Approximately a minute later, appellant made the statement, "I need to call my lawyer, man." The statement was recorded on an audio/video feed inside the interrogation room. There is no evidence anyone was watching the audio/video feed at the time. When Ahrens came into the room approximately twenty-three minutes later, appellant did not ask for a lawyer or repeat his statement. Instead, Ahrens read the *Miranda* warnings to appellant, and appellant agreed he understood his rights and spoke with Ahrens. Approximately an hour and a half later, appellant asked for a lawyer. We conclude appellant's single reference to a lawyer, made to an unmonitored camera and not repeated to Ahrens when Ahrens came inside the interrogation room, did not constitute a clear invocation of the right to counsel during questioning. *See Davis*, 512 U.S. at 459; *Gobert*, 275 S.W.3d at 892. We overrule appellant's second issue.

In his third issue, appellant argues he received ineffective assistance of counsel. Specifically, appellant complains of the admission of the television pawn ticket showing appellant's name, address, and identification number; the name of the pawn shop; a description of the television; and the date of the transaction. Appellant argues his counsel was ineffective in (1) failing to object to the business records affidavit accompanying the introduction of the pawn ticket because the affidavit was not notarized, (2) failing to object to the testimony of the detective who found the pawn ticket in appellant's pocket on the ground the detective was not qualified to authenticate the content of the pawn ticket, and (3) failing to request that the court redact the content of the ticket. We review these claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

Under *Strickland*, appellant must prove that his trial counsel's representation was deficient and that the deficient performance was so serious that it deprived him of a fair trial. *Id.* at 687. Counsel's representation is deficient if it falls below an objective standard of reasonableness. *Id.* at 688. This deficiency will deprive appellant of a fair trial only when counsel's performance prejudices appellant's defense. Id. at 691–92. To demonstrate prejudice, appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the claim of ineffectiveness. *Id.* at 697. This test is applied to claims arising under both the United States and Texas Constitutions. *See Hernandez* v. State, 726 S.W.2d 53, 56–57 (Tex. Crim. App. 1986).

A sound trial strategy may be imperfectly executed, but the right to effective assistance of counsel does not entitle a defendant to errorless or perfect counsel. *See Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). As a reviewing court, we look to the totality of the

representation and to the circumstances of the case, not to isolated instances in the record reflecting errors of commission or omission. *Id.* Moreover, we consider the adequacy of assistance as viewed at the time of trial, rather than through hindsight. *Id.* at 482.

Our review of defense counsel's performance is highly deferential, beginning with the strong presumption that the attorney's actions were reasonably professional and motivated by sound trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Ordinarily, counsel must be accorded an opportunity to explain his actions before being condemned as unprofessional and incompetent. *See Bone v. State* 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). When the record is silent as to trial counsel's strategy, we will not conclude that appellant received ineffective assistance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

The record in this case is silent as to why trial counsel did not object to the admission of the pawn ticket found in appellant's pocket when he was arrested. Trial counsel did object to the business records affidavit and "accompanying pages" as irrelevant. Trial counsel may have avoided raising further objections because the pawn ticket was in appellant's pocket, and appellant's theory was that appellant purchased the television from "Matt" and pawned it to pay a bill. Under these circumstances, we cannot conclude appellant received ineffective assistance of counsel. *See id.*; *Thompson*, 9 S.W.3d at 813. We overrule appellant's third issue.

We affirm the trial court's judgments.

Do Not Publish                                        /David L. Bridges/
TEX. R. APP. P. 47                                DAVID L. BRIDGES
121329F.U05                                        JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

LAKENDRICK DUMANDRE HAYDEN,
Appellant

No. 05-12-01329-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 265th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F09-62407-R.
Opinion delivered by Justice Bridges.
Justices Lang and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered May 13, 2015.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LAKENDRICK DUMANDRE HAYDEN,
Appellant

No. 05-12-01336-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 265th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F11-61298-R.
Opinion delivered by Justice Bridges.
Justices Lang and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered May 13, 2015.